**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

SUSAN D. LILLY,                                      :
                                                     :
                          Plaintiff,                 :
                                                     :
          v.                                         :     CIVIL ACTION NO.: 10-30-LPS/MPT
                                                     :
MICHAEL J. ASTRUE                                    :
Commissioner of Social Security,                    :
                                                     :
                          Defendant.                 :

## REPORT AND RECOMMENDATION

### I. **Introduction**[1]

Plaintiff Susan Lilly ("Lilly") appeals from the decision of defendant Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act").[2]

Lilly and the Commissioner filed cross-motions for summary judgement.[3] Lilly seeks an award of benefits, or, in the alternative, remand for further analysis by a different Administrative Law Judge ("ALJ"),[4] with instructions that appropriate deference be given to the opinions of her treating sources.  The Commissioner requests that the ALJ's  decision be affirmed.[5]

---

[1] Unless otherwise indicated, all facts are taken from supporting briefs submitted by the parties and case record.
[2] 42.U.S.C. §§ 401-433, 1381-1383f.
[3] (D.I. 8).
[4] Under the fourth sentence of 42 U.S.C. § 405(g), as incorporated by 42 U.S.C. § 1383(c)(3).
[5] (D.I. 24).

## II.  Background

### A.  Procedural History

Lilly filed a Title XVI application for SSI and a Title II application for DIB on April 11, 2006.  Her claims were initially denied by the Commissioner on the basis that her condition is not severe enough to prevent employment.  After denial of her application at the pre-hearing stage, Lilly requested a hearing before an ALJ, which occurred on April 17, 2008.

On September 9, 2008, the ALJ found Lilly was not disabled within the meaning of the Act and denied her request for benefits.  Subsequently, Lilly filed a request for review with the Appeals Council.  Her request was denied without substantive explanation.  After exhausting all available remedies, Lilly brought this civil action[6] seeking judicial review of the ALJ's decision.

### B.  Factual History

1.  Medical Assessment

On June 6, 2005, while under the care of Dr. Rowe,[7] Lilly worked as a dental assistant.  She complained of numbness and tingling in both hands, despite wearing wrist splints.  She also stated at night, her knee would swell and cause discomfort.  An EMG[8] showed moderate right carpal tunnel syndrome with mild to moderate severity on the left and moderate on the right.[9]  Lilly was diagnosed with right lateral epicondylitis, right forearm extensor muscle strain, left knee internal derangement, left knee patellar

---

[6] Under 42 U.S.C. § 409(g) as incorporated by 42 U.S.C § 1383(c)(3).
[7] Glen  D. Rowe, D.O. reviewed the EMG performed on both upper extremities.
[8] Electromyography involves testing the electrical activity of muscles.

[9] This procedure was performed on May 23, 2005.

tendonitis, left knee patellofemoral syndrome and a history of juvenile rheumatoid arthritis.  She was proscribed Naprosyn and Vicodin.  Shortly thereafter, Lilly quit working on August 23, 2005.

On January 10, 2006, she was evaluated by Dr. Tamesis, a rheumatologist, for complaints of multiple joint pain.  Assessment of her complaints led to the following diagnoses:  DJD[10] of the knee; left shoulder arthropathy; bilateral carpal tunnel syndrome; low back pain, suggestive of lumbar spondylosis or sacroilitis; and inflammatory arthritis, likely psoriatic arthritis.  On January 11, 2006, Lilly's rheumatoid factor was 33.1.[11]

On February 1, 2006, her complaints were continuing left shoulder and hip pain, chronic back pain, stiffness lasting an hour, morning fatigue and poor sleep.  The symptoms were not relieved by the previously prescribed medications.  In addition, Dr. Tamesis noted mild pain in the left shoulder on range of motion, no tenderness of the carpal bones, left shoulder impingement, psoriasis, tenderness on palpation of both sacroiliac joints, and knee crepitus.  X-rays of her lumbar spine, left shoulder and hand were normal.

Her complaints in February 2006 remained unchanged during March 2006, with the exception of additional symptoms of hip, knee and elbow pain.

During an office visit with Dr. Tamesis on April 9, 2006, her elbow and left shoulder pain had improved, but pain in both hips and wrists and the stiffness remained unchanged.  Dr. Tamesis confirmed pain of the left shoulder and knee crepitus, left

---

[10] Degenerative Joint Disease (D.I. 24).
[11] Any reading above 20 is elevated and positive.

shoulder impingement and psoriasis/psoriatic arthritis.

In May 2006, Lilly complained of pain in her hips, knees, wrists and back, with continued stiffness.  In June 2006, Dr. Tamesis referred Lilly to Dr. John Asman.[12]  A follow up visit in July 2006 showed the psoriasis was somewhat improved.  However, she still complained of pain all over, worse in the hips and heel, with swelling of the feet.  In September 2006, her pain, swelling, stiffness, morning fatigue and poor sleep continued.  Dr. Tamesis's examination revealed left shoulder pain on range of motion, tenderness of the sacroiliac joints, and knee crepitus.

In October 2006, Lilly complained of stiffness lasting for three hours and chronic hip, heel, foot and back pain.  At that time, the psoriasis/psoriatic arthritis had improved.  Dr. Tamesis's examination revealed pain on range of motion in both shoulders, tenderness of the carpal bones and sacroiliac joints, knee crepitus, multiple tender points on palpation of diffuse muscle groups and fibromyalgia syndrome.

Medical consultant Dr. Borek completed an PRFC[13] assessment on December 28, 2006.  After reviewing medical records from Drs. Rowe and Tamesis, he concluded Lilly was capable of sedentary, possibly light work.

After Dr. Borek's assessment, other records and reports were added to Lilly's medical file, including two visits with Dr. Tamesis, one occurring on November 17, 2006.  During that visit, Dr. Tamesis's examination revealed pain on range of motion in  both shoulders, tenderness of the carpal bones, knee crepitus and multiple tender points on palpation of diffuse muscle groups.  During the subsequent visit on February 12, 2007,

---

[12] To start her on Remicade infusions for the arthritis.
[13] Physical Residual Function Capacity Assessment.

Lilly complained of right shoulder, mid-back, elbow, heel and foot pain worsening with prolonged sitting, stiffness lasting for three hours, morning fatigue, poor sleep and return of her psoriasis.  The diagnoses included persistent polyarthralgia and fibromyalgia syndrome.

Another record not included in Dr. Borek's assessment is Lilly's visit on May 22, 2007 with Dr. Chester.[14]  He noted her primary care physician increased her Xanax and her rheumatologist prescribed Trazadone for sleeping problems.  She reported her daily routine started at 6:30 a.m. preparing breakfast for her children and sending them to school.  It included caring for the youngest child, washing dishes, doing laundry, preparing dinner, and supervising her children's homework and evening baths.  Her children helped with the laundry, dishes, cooking and vacuuming.  Although Lilly admitted to drinking alcohol and smoking marijuana, she claimed such habits did not interfere with her functioning.  She further noted she quit her job to stay home after one of her children was molested by an older child.  Lilly described a chaotic childhood where her father beat her severely on a daily basis with a belt.  During the interview, she was loud, dramatic and used foul language, but her memory and concentration were intact and her insight and judgment were fair.  Dr. Chester assessed her as a victim of abuse with a borderline personality disorder, having a GAF of 60,[15] mild to no limitations in mental faculties related to work, moderate impairment in her ability to relate to other people and to perform work requiring contact with others.

---

[14] Dr. Chester is a consulting psychiatrist who evaluated Lilly at the request of the Commissioner.
[15] The Global Assessment Functioning Scale (GAF) is used to rate an individual's overal psychological, social and occupational functioning.  A GAF score in the range of 51 to 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends and conflicts with peers or coworkers)."

On May 30, 2007, Lilly was examined by Dr. Bongalos, a consultant, who noted her history of chronic back pain, stiffness, fatigue, polyarthralgia, myalgias of the muscles and joints of the extremities.  Lilly claimed she stopped working in August 2005 primarily because of low back pain, polyarthragia, myalgias, pain and weakness of the wrists, hand grasps and grips.  He observed during the physical exam that her range of motion in the extremities was full except for the right shoulder.  She exhibited a 60 degree limitation on bending and complained of soreness and stiffness when performing range of motion maneuvers.  Dr. Bongalos did not feel Lilly put forth her best effort during the exam.  He concluded possible fibromyalgia rather than juvenile rheumatoid arthritis.

On June 1, 2007, Dr. Acuna[16] affirmed the findings of Dr. Borek.  He reviewed the PRFC along with associated findings, limitations and MER,[17] and found the PRFC to be consistent.  He noted since Lilly's last disability report, she did not indicate any change in her condition.

After the review by Dr. Acuna, Lilly underwent further treatment which generated additional reports.  A Field Disability Report was prepared wherein Lilly claimed her back pain was unbearable, and the pain had worsened in her shoulder, neck, legs and ankles.

In a progress note dated August 29, 2007, Dr. Tamesis noted Lilly had pain all over, swelling of the feet, stiffness lasting two hours, morning fatigue and poor sleep. She also experienced pain on range of motion of the left shoulder, but no tenderness of

---

[16] Jose Gonzalez-Acuna, M.D. from the Division of Developmental Disabilities Services office.
[17] Medical Examination Report.

carpal bones and knee crepitus.

On November 8, 2007, Lilly self-referred to Dr. Robert Moyer[18] for evaluation of her rheumatoid arthritis and psoriasis.  His examination revealed no back tenderness, with minimal trigger points, negative straight leg raising and a normal range of motion of the joints, except the right shoulder, with slight decreased abduction and internal rotation.  Dr. Moyer found no active process or significant joint damage from the rheumatoid arthritis.

Dr. Moyer referred Lilly to Dr. Swaminathan,[19] who evaluated her in November 2007 and noted her complaints of chronic neck, low back, bilateral knee and multiple joint pain related to rheumatoid arthritis.  She exhibited a pain intensity of 6 out of 10 in multiple joints that worsened with cold weather.  His findings included:  chronic low back, neck and thoracic spine pain secondary to lumbar facet joint syndrome, secondary bilateral osteoarthritis of the knees, wrists, elbows and shoulders, rheumatoid arthritis and anxiety and depression.  During another visit on December 13, 2007, Dr. Swaminathan observed pain and tenderness on lumbar extension, ropiness and spasm in the paraspinal area, swelling in both knees, joint tenderness, right carpal tunnel syndrome and chronic lumbar spine pain.

He also reviewed an MRI of the lumbar spine on March 14, 2008, noting findings compatible with a SLAP[20] tear, paralabral cyst formation and moderate degenerative changes of the A.C. joints.

Dr. Tamesis completed an arthritis RFC questionnaire on April, 2008 and

---

[18] Dr. Moyer is a rheumatologist and internist.
[19] Dr. Karik Swaminathan is a pain management specialist.
[20] Superior labral anterior to posterior.

forwarded it to Dr. Banas on May 2, 2008.  Dr. Tamesis reported seeing Lilly every one to two months, and his diagnoses of psoriatic arthritis and fibromyalgia.  He noted her pain was so severe it frequently interfered with her attention and concentration, and low stress jobs could not be tolerable due the pain medication.  He described her physical limitations as walking 1 to 2 city blocks without rest or severe pain, sitting 15 minutes and standing for 10 minutes at a time, with sitting, standing and walking less than 2 hours a day and the need for periods of walking during an 8 hour work day.  According to Dr. Tamesis, any job would require shifting positions at will from sitting, standing or walking and unscheduled breaks 3-4 times a day, with each break lasting 10-15 minutes.  Lilly could rarely lift less than 10 pounds and should never stoop, crouch or climb ladders.  He noted significant limitations in repetitive reaching, handling or fingering and use of either hand only 5 percent of the day.  On average, she would miss work for 4 days a month.

Dr. Hazlett[21] began treating Lilly on December 13, 2007 and saw her several times thereafter.[22]  He noted during the March 6 visit that she was more depressed with poor energy and motivation.  At that time, she walked with an obvious limp and complained of pain.  She admitted to using both alcohol (ocassionally) and marijuana nightly to relax.  Dr. Hazlett's diagnosis was bipolar disorder, and he adjusted her medications.

2.  Written Statements by Family and Friends.

Lilly's friend wrote that she previously spent the entire day shopping, but

---

[21] Dr. Donald Hazlett is a psychiatrist.
[22] He saw her on December 20, 2007,  January 22, February 5 and March 6, 2008.

presently only has the stamina to stop at one store due to pain.  Another friend stated Lilly usually has difficulty rising from bed due to severe pain, can no longer take walks due to joint pain, and is unable to sit for prolonged periods.  Lilly's daughter wrote her mother has difficulty moving around the house, cooking dinner, or reaching above and below due to pain.  Lilly's mother advised her daughter suffers dizziness and sleepiness because of the medications, is fearful of falling while navigating stairs, and is frequently tearful and depressed.

3.  Administrative Hearing

During the April 17, 2008 hearing, Lilly testified she stopped working because of personal problems with her stepchildren.  She frequently lays down because of back pain, and suffers from juvenile rheumatoid arthritis, psoriatic arthritis and fibromyalgia. She rated her chronic pain at 7-8 despite medication.  She could stand for extended periods, and has difficulty with her hands as a result of carpal tunnel syndrome.  She is depressed, is under treatment with a psychiatrist, and smoked marijuana in the past to relieve stress.  She relies on friends for transportation.  She could not work as a dental hygienist because her back pain limits her ability to stand or sit and frequently needs to sit for 15 to 20 minutes.  Her medications make her dizzy, sleepy and loopy.  She cannot  kneel or open a jar or lift a gallon of milk without using both hands. She cannot write for long periods of time, and could probably lift or carry 10 pounds for approximately 6 to 7 feet using both hands and arms.

*i. Vocational Expert Testimony*[23]

The Vocational Expert ("VE") classified Lilly's past work as a dental assistant as

---

[23] Tony Melanson was the vocational expert present at the administrative hearing.

skilled and light work.  To determine if she could perform other work in the national

economy, the ALJ asked the VE to consider a hypothetical individual whose education,

work history, symptoms and limits were similar to that of Lilly's.  The VE was asked to

consider an individual who was limited to sedentary exertional work with simple, routine

tasks, no overhead work, no continuous use of the upper extremities, and a sit/stand

option.  The VE concluded the individual was incapable of performing any job based on

the pain, the limitations for sitting and standing and the concentration problems Lilly

discussed.

In response, the ALJ proposed a second hypothetical of an individual capable of

working at a sedentary level at employment simple and routine in nature, not involving

any overhead work, having a sit/stand option and entailing frequent or occasional use,

but not extended continuous use, of the upper extremities.  The VE testified jobs existed

for such a person, but he based his testimony regarding sit/stand options on his own

experience.  Those jobs that could accommodate Lilly's functional limitations were a

non-governmental security monitor (representing 250 jobs in local economy and

120,000 in national economy), information clerk (200 jobs in the local economy and

80,000 in national economy) and clerical sorter/addressor (100 jobs in the local

economy and 45,000 in national economy).

### ii.  ALJ's Findings

The ALJ determined Lilly's impairments included lumbar degenerative disc

disease, carpal tunnel syndrome, osteoarthritis, fibromyalgia, myofascial pain

syndrome, and superior labral anterior to posterior tear of the left shoulder with

paralabral cyst.  He found she had the residual functional capacity to perform simple,

routine, sedentary work, except she could lift 10 pounds occasionally, less than 10

pounds frequently, stand or walk for 2 hours and sit for 6 hours in an 8 hour day with a

sit/stand option, no overhead reaching and only infrequent grasping, fingering and

handling with the right upper extremity.

The ALJ accused Lilly of trying to influence him and Drs. Bongalos and Chester

through her statements and demeanor.  He found the record failed to document

sufficient objective medical evidence to substantiate the severity of the pain and degree

of functional limitations as alleged.  He concluded her complaints of pain were

inconsistent with the record, and no evidence corroborated any impairment or

combination of impairments that could reasonably support the pain and other symptoms

of such severity or frequency to contradict the RFC.

He noted none of the lay witnesses were trained in vocational rehabilitation and

only assigned weight to their statements if they were consistent with Lilly's RFC.  He

accorded little weight to the opinion of her treating physician, Dr. Tamesis, because his

conclusion was inconsistent with the record, and his lack of expertise in vocational

training and occupational health prevented a balanced review of her limitations.  The

ALJ noted Dr. Tamesis relied heavily on Lilly's subjective complaints regarding her

physical impairments, and the totality of medical evidence showed her restrictions were

not as severe as determined by Dr. Tamesis.

4.  Medical Records and Reports Submitted to the Appeals Council[24]

On April 16, 2008, Dr. Tamesis noted Lilly had swelling in her left fingers and left

---

[24] Dr. Tamesis's records were *not available* until after the hearing.  Dr. Manifold records were *not obtained* until after the hearing.

knee, and throbbing lower back and right hip pain.  His assessment included

fibromyalgia syndrome.  On July 23, 2008, Lilly experienced the same symptoms and

the assessment remained the same.  In an urgent visit on September 22, 2008, Lilly

reported systemic pain in her neck, shoulders and knees and feet when walking.

However, Dr. Tamesis assessment remained the same.  On October 29, 2008, Lilly

presented with systemic pain, including throbbing low back pain at both sacroiliac joints,

stiffness lasting two hours, morning fatigue and poor sleep.  On December 8, 2008, she

experienced stabbing pain to the right knee, and pain all over including the neck,

shoulders, knees and hips.  Examination revealed pain in both shoulders on range of

motion, tenderness of the carpal bones and both sacroiliac joints, multiple tender points

on palpation of diffuse muscle groups, and mild knee crepitus.  The assessment at that

time was right knee pain, mild DJD, low back pain, sciatica, disc bulges, bilateral

shoulder impingement, bursitis, status post left rotator cuff surgery, psoriasis, psoriatic

arthritis and fibromyalgia syndrome.  When Lilly returned for a follow up visit because of

increased symptoms, her left knee was swollen and would not bend.  Dr. Tamesis

assessment, however, remained unchanged.

Dr. Stephen Manifold performed shoulder surgery on June 10, 2008.  At a post-

operative follow up visit, Lilly reported some occasional soreness while doing range of

motion exercises.

## III.  Analysis

### A.  Legal Standard

#### 1.  *Motion for Summary Judgement*

In determining whether summary judgement is appropriate under Rule 56(c),

the court may not make credibility determinations or weigh the evidence, but must review the record taken as a whole and draw all reasonable inferences in favor of the nonmoving party.[25]  If the court determines there is no genuine issue as to any material fact and the movant is entitled to judgement as a matter of law, summary judgement is appropriate.[26]

## 2.  Review of the ALJ's Findings

The court, in performing its review, must determine whether the ALJ applied the correct legal standards.[27]  The court must also determine whether the ALJ's decision denying DIB and SSI claims is supported by substantial evidence.[28]  Substantial evidence means less than a preponderance of the evidence, but more than a mere scintilla of evidence;[29] it is such relevant evidence that reasonable minds might accept as adequate to support a conclusion.[30]  The court should not undertake a de novo review of the ALJ's decision or re-weigh the evidence of record.[31]  However, judicial review as to whether substantial evidence supports the findings is more than a quantitative exercise:  it is a qualitative review in which each piece of relevant evidence is considered in relationship to all other evidence.[32]

Although the court's review is limited to the evidence actually presented to the ALJ, evidence that was not submitted to the ALJ may be considered as a basis for

---

[25] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[26] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).
[27] *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983).
[28] 42 U.S.C § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[29] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).
[30] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *see also Rutherford,*  399 F.3d at 552.
[31] *Pierce, 487 U.S.* at 552; *see also Mansour Med. Ctr.*, 806 F.2d at 1190.
[32] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

remanding the matter to the ALJ for further proceedings.[33]  Credibility determinations are the province of the ALJ, and should only be disturbed on review if not supported by substantial evidence.[34]

A single piece of evidence will not satisfy the substantiality test if the ALJ ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence, particularly evidence offered by treating physicians, or if it is not evidence, but constitutes mere conclusions.[35]

The inquiry, therefore, is not whether the court would have made the same determination, but rather, whether the ALJ's findings were reasonable.[36]  Even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the decision if it is supported by substantial evidence.[37]

### B.  Positions of the Parties

#### 1.  *Plaintiff*

Lilly contends the ALJ failed to give proper weight to the medical opinion of her treating physician, Dr. Tamesis.  She argues the ALJ's reasoning for giving little weight to his opinion, because he primarily relied on her complaints, and his purported lack of expertise in vocational training and occupational health, was unwarranted.  Lilly maintains a diagnosis of fibromyalgia includes reliance on a patient's subjective complaints.  A rheumatologist has the most expertise in determining a patient's

---

[33] Pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).
[34] *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008).
[35] *Kent,* 710 F.2d at 114.
[36] *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983).
[37] *Monsour Med. Ctr.*, 806 F.2d at 1190-91.

limitations, and is the primary specialist who treats fibromyalgia.  Therefore, the ALJ

should have given Dr. Tamesis's opinion greater, if not controlling, weight because he

was the only rheumatolgoist who offered an opinion, and he treated Lilly for at least two

years.

Lilly further argues the ALJ's conclusion that there was insufficient

documentation of objective medical evidence to substantiate the severity of the pain and

degree of functional limitations is an inappropriate criteria for evaluating fibromyalgia.

Lilly contends the ALJ improperly weighed the non-examining consultants' RFCs.

Dr. Borek's findings of limited ability of the upper extremities was interpreted by the ALJ

to mean that Lilly could do things frequently.  The ALJ accepted Dr. Borek's opinion she

could perform sedentary work.  The RFCs, however, are opinions of non-examining

physicians and failed to consider later crucial medical records.

Lilly asserts the ALJ's determination of her lack of credibility is improper and

without merit.  Though Lilly testified experiencing good and bad days as to her pain level

and the overall worsening of her condition, the ALJ discredited her credibility because

she reported different pain levels during her doctors' visits.

Lilly maintains the ALJ improperly concluded she tried to influence the findings of

Drs. Chester and Bongalos, which is not supported by either doctors' opinions.  She

was given no opportunity to rebut this finding since the ALJ did not raise the issue

during the hearing, and only reached his conclusion once the record closed.

She argues the RFCs did not fully account for her increased pain and its

restricting effects, medication side effects and her limited ability to sit or walk. Therefore,

reliance on the RFCs in the hypothetical question, which concludes she is capable of

substantial gainful activity, was in error.

Finally, Lilly notes the testimony of the VE is flawed.  He opined Lilly can perform sedentary jobs with a sit/stand option, a term not defined by the ALJ.  Moreover, the VE based his testimony on his own experience.

2.  *Commissioner*

The Commissioner argues the ALJ's evaluation of Dr. Tamesis's opinion was consistent with the regulations.  Because the evidence showed her limitations to be less than Dr. Tamesis suggested, the ALJ properly concluded his review was not balanced.  Dr. Tamesis relied too heavily on Lilly's subjective complaints, and opinions regarding disability are administrative findings reserved to the Commissioner or the ALJ, and not Dr. Tamesis.  The Commissioner argues Dr. Tamesis's suggestion Lilly could not perform sedentary work, was not well supported by medically acceptable clinical and laboratory diagnostic techniques, and was inconsistent with the other substantial evidence in the record, including the opinion of Dr. Borek.

The Commissioner contends the ALJ appropriately weighed the examining and non examining physicians' opinions.  The non treating physicians are highly qualified experts in social security disability evaluations.  Their opinions are considered expert opinions on disability issues under the Act and are entitled to weight.  Dr. Tamesis's post hearing opinion is a vocational opinion on the ultimate issue, unsupported by the findings.

Lilly's daily activities, which are factors under the regulations the ALJ must consider when evaluating a claimant's subjective symptoms, reasonably suggest she met the minimal physical demands of sedentary work.

16

Because the ALJ determines credibility on the ultimate issue of disability, the Commissioner notes the ALJ is charged with assessing a claimant's credibility in the context with the other evidence before him.  His determination that Lilly's testimony was not entirely credible is supported by substantial evidence.

The Commissioner maintains the ALJ properly applied Lilly's RFC to his analysis. He accounted for her carpal tunnel syndrom using only the minimal physical demands of sedentary work and by including occasional use of the upper extremities in the hypothetical question.

Further, the VE properly relied upon his professional experience when testifying the identified jobs permitted a sit/stand option.  The DOT[38] lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is actually performed.

3.  *Lilly's Rebuttal*

Lilly responds the Commissioner failed to address at least four of her substantive arguments:  it was legal error for the ALJ to discredit the opinion of Dr. Tamesis; the ALJ failed to evaluate and consider the findings of Dr. Swaminathan; the ALJ engaged in character assassination to buttress his indefensible opinion on her credibility and, his reliance on the VE's responses to the hypothetical question about sedentary jobs with a sit/stand option was improper.  The failure of the Commissioner to address these matters warrants remand.

---

[38]  The Dictionary of Occupational Titles was developed by the U.S. Department of Labor in an effort to standardize occupational information to support job placement activities.  U.S. Dept. of Labor, *Dictionary of Occupational Titles Introduction*, Nov. 1, 2011, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTINTRO.HTM.

Lilly maintains the Commissioner has selectively quoted from the record, while ignoring contrary evidence, such as the limitations on her daily activities, which refute a finding she could perform sedentary work.  Moreover, the opinions of Drs. Bongalos, Moyer and Swaminathan do not suggest Dr. Tamesis exaggerated her restrictions.  As a result of his single contact with Lilly, Dr. Moyer diagnosed fibromyalgia, while Dr. Borek, who is not a rheumatologist and never examined her, completed his report eighteen months before the hearing.

Although determining whether a claimant is disabled falls within the purview of the ALJ, he cannot cherry pick which medical opinions to consider.  Rather, the Commissioner's criticism of Dr. Tamesis's use of a checkbox form is misplaced, since Dr. Borek rendered his opinion using a similar format.

Based on the substantive errors in the ALJ's opinion and the failure of the Commissioner to address certain of her arguments, Lilly requests remand.

### C. Whether the ALJ's Decision is Supported by Substantial Evidence

 Lilly contends the ALJ's decision is not supported by substantial evidence, specifically, the ALJ failed to give proper weight to the medical opinion of Dr. Tamesis, her treating physician, and gave improper weight to the opinions of non-examining consultants who prepared the RFCs.

Under Third Circuit law, a treating physician's reports are accorded great weight, particularly when the opinions reflect expert judgement based on a continuing observation of the claimant's condition over a period of time.[39]  A court considering a

---

[39] *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)) (applied controlling weight where treating physician's opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in the record).

claim for disability benefits must give greater weight to the findings of a treating physician than to those of a physician who has examined the claimant only once or not at all.[40]  The ALJ may reject a treating physician's opinion if it is based on contradictory medical evidence;[41] however, where contradictory medical evidence exists, the ALJ must still carefully evaluate the appropriate weight accorded to a treating physician's opinion.[42]

In the instant matter, the ALJ assigned little weight to the treating physician's opinion because Dr. Tamesis purportedly lacked vocational expertise, relied too heavily on Lilly's subjective complaints, and used a checkbox report.

A fibromyalgia diagnosis is based on the patient's complaints coupled with the physician's objective finding of tender points on palpation of diffuse muscle groups consistent with the complaints.[43]  Dr. Tamesis, as Lilly's primarily rheumatologist, conducted multiple exams and concluded her symptoms were consistent with fibromyalgia.

Although Dr. Tamesis is not a vocational expert, his specialization in rheumotology provides expertise in determining a patient's physical limitations due to fibromyalgia.  The Commissioner relies on *Mason* (where a checkbox report was found

---

[40]  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

[41]  *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).

[42]  *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008); *see also* Social Security Regulation ("S.S.R.") 96-2p, 1996 SSR LEXIS 9, at *9-10 (July 2, 1996) (noting that "a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight").

[43]  Based on a memorandum by the Social Security Administration.  Soc. Sec. Admin. Deputy Comm'r. for Disability and Income Sec. Program. Memo., *Fibromyalgia, Chronic Fatigue Syndrom Objective Medical Evidence Requirements for Disability Adjudication* (May 11, 1998), http://www.myalgia.com/SSA_FM.htm.

to be weak evidence)[44] arguing Dr. Tamesis's opinion was conclusory and entitled to minimal weight.  Unlike Dr. Tamesis's report, however, the report in *Mason* was prepared by a *non-treating* physician.  Inconsistent with the findings in *Mason,* the ALJ in the present matter attached considerable weight to Dr. Borek's opinion, who used a checkbox report, never saw Lilly, and based his opinion on a partial record one and a half years before the hearing.  Given the sound medical analysis by Dr. Tamesis to diagnose fibromyalgia and his expertise and familiarity with Lilly's conditions, the limited weight afforded his opinion by the ALJ was in error.

The Commissioner contends Dr. Tamesis's opinion was inconsistent with other substantial evidence, including the opinions of Drs. Bongalos, Moyer, Borek and Acuna, but fails to support this argument.  Dr. Bongalos concluded Lilly experienced more fibromyalgia symptoms than juvenile rheumatoid arthritis.  Thus, his findings do not contradict Dr. Tamesis's diagnosis of fibromyalgia.  Dr. Moyer found no active arthritic process or significant joint damage, recommended for Lilly to continue her Remicade treatments and implemented other non-pharmacological treatments.  Since Remicade is a medication used for rheumatoid arthritis, as well as other auto-immune conditions, this recommendation does not conflict with Dr. Tamesis's findings.

Dr. Borek suggested Lilly could perform sedentary work, which contradicts Dr. Tamesis's conclusion.  However, Dr. Borek's assessment occurred eighteen months prior to the hearing and did not include the medical record developed after his review. That record includes visits with Dr. Tamesis in November 2006 and February 2007, when he diagnosed polyarthralgia and fibromyalgia syndrome.  Another report not

---

[44] 994 F.2d at 1065.

available to Dr. Borek was the May 2007 visit with Dr. Chester, who assessed Lilly as an abuse victim with moderate impairment to relate to and work with others.  After Dr. Borek's review, Lilly was also evaluated by Dr. Swaminathan in November 2007, who diagnosed chronic low back, neck and thoracic spine pain, rheumatoid arthritis, anxiety and depression; and Dr. Bongalos, who in May 2007, diagnosed possible fibromyalgia. In light of the significant findings not available to Dr. Borek during his review, the ALJ erred in giving his opinion controlling weight.

### D. The ALJ Improperly Discredited Lilly's Testimony

Lilly argues the ALJ's conclusion that she was inconsistent in her reports of pain was not proper ground to discredit her credibility.  The ALJ found Lilly was inconsistent when she described her pain intensity to Dr. Swaminathan, during a visit in November 2007, as 6 out of 10, but testified at the hearing in April 2008 that the intensity was  7-8 out of 10.  Further, the ALJ determined Lilly tried to improperly to influence of Drs. Chester and Bongalos through her statements and demeanor, and therefore, was not credible.

Courts usually defer to an ALJ's determination on credibility because the ALJ has the opportunity to assess the claimant's demeanor.[45]  In the present matter, Lilly consistently testified she experienced good and bad days, her condition was worsening, and her medical records reflect her pain varied from day to day.  The ALJ pointed to Dr. Chester's brief description of her dramatic behavior, as well as her differing history to Drs. Bongalos and Chester regarding alcohol and drug use.  Neither Lilly nor any physician has represented that her drug or alcohol usage affected her ability to work.

---

[45]   *Alt. Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir. 1983).

21

Furthermore, neither Drs. Chester nor Bongalos stated Lilly was deceptive.  Thus, the

ALJ's finding on Lilly's credibility is not supported by substantial evidence.

### E.  The RFC by Dr. Borek was Based on an Incomplete Medical Record and the Testimony of the VE is Flawed

Lilly contends that Dr. Borek's RFC does not fully account for her severe CTS,[46]

which greatly limits the use of her dominant upper extremity.  Further, the RFC fails to

account for the effects of pain.  It also does not address her increasing pain, medication

side effects, her inability to sit or walk for any length of time, the physical impairments to

her wrists, shoulders and knees, and her arthritis and fibromyalgia.  The Commissioner

responds if Lilly experienced significant limitation from CTS, she would have undergone

the carpal tunnel release procedure that she agreed to previously.  He further notes she

managed the carpal tunnel with splints and the medication, Naprosyn.[47]  The

Commissioner also maintains the ALJ considered her CTS by limiting his hypothetical

question to the minimal physical demands of sedentary work and included "no

continuous use of the upper extremities."[48]

The initial RFC, completed by Dr. Borek almost two years before the hearing,

does not address Lilly's increased pain, medication side effects or her inability to sit or

walk for any length of time.  To the extent the hypothetical question relied on that RFC

and failed to account for these limitations or side affects supported in the medical

record, the hypothetical question was incomplete and does not provide substantial

evidence that Lilly is capable of SGA.[49]

---

[46]  Carpal tunnel syndrome.
[47]  Naprosyn is an anti-inflammatory drug.
[48]  (D.I. 13 at 49).
[49]  Substantial gainful activity.

Lilly argues the VE's testimony was flawed because he listed sedentary jobs that offer a sit/stand option, a term undefined by the ALJ, based his testimony on his own experience, and provided no details on the number of jobs offering a sit/stand option.

The Commissioner notes the maximum requirements under DOT describe occupations as they are generally performed and not the range of requirements for a specific job setting.  Furthermore, the VE is permitted to rely upon his professional experience when testifying to whether an identified job permits a sit/stand option.

Rule SSR 96-09p[50] provides an ALJ may consult a vocational expert where a sit/stand option is necessary.  Moreover, Rule SSR-83-12 provides if a claimant must alternate periods of sitting and standing, then that person is not functionally capable of prolonged sitting contemplated in the definition of sedentary work.[51]  The ALJ's first hypothetical considered Rule SSR-83-12 where the individual described had all the symptoms and restrictions Lilly reported during the hearing.  The VE responded if that claimant was found to be fully credible, she could not perform any jobs.  In the second hypothetical posed, the claimant depicted was capable of performing sedentary employment, with no overhead work, a sit/stand option, and frequent or occasional use of the upper extremities, to which the VE responded that jobs existed.

Though the ALJ is allowed to rely on the expertise of the VE, the conflict between the limitations on sedentary work placed by the Rulings and the VE's testimony were not resolved by the ALJ, which was in error.  Clearly the VE's response to the first hypothetical, which included all of Lilly's limitations, indicates she cannot perform any

---

[50] SSR 96-09p, http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-09-di-01.html.
[51] *Boone v. Barnhart*, 353 F.3d 203, 210-11 (3d Cir. 2004).

job.  Additionally, when asked by Lilly whether additional limitations, such as excessive absence from work or a 50% limitation on the use of the hands, would preclude a claimant from employment, the VE testified that the minimum standards set by employers regarding absence and productivity would render the claimant unemployable with these limitations.  Because the ALJ gave little weight to Dr. Tamesis's opinion and found Lilly not credible, his  second, modified hypothetical disregarded certain limitations based on her credibility and treating physician's findings, which has been previously determined herein as inadequately explained by the ALJ. Therefore, the ALJ's reliance on the VE's testimony was in error.

## III.  Order and Recommended Disposition

For the reasons stated herein, this court recommends that:

(1) The Commissioner's motion for summary judgment (D.I. 24) be denied, and Lilly's motion for Summary Judgment[52] be granted in part.

(2) The matter be remanded for further analysis not inconsistent with this recommendation.

(3) Lilly's request for an award of benefits[53] be denied.

This Report and Recommendation is filed pursuant to 28 U.S.C § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.[54]  The objections and responses to the objections are limited to ten (10) pages each.

---

[52] (D.I. 17).
[53] (D.I. 18 at 28).
[54]  Fed. R. Civ. P. 72(b).

The parties are directed to the Court's standing Order in Non Pro Se matters for Objections filed under Fed. R. Civ. P. 72, dated November 16, 2009 , a copy of which is available on the Court's website, www.ded.uscourts.gov.


Date: January 30, 2012                          /s/ Mary Pat Thynge
                                                United States Magistrate Judge